■ NORMAN EISNER, Respondent-Appellant, v ARTHUR D. GOLDSTEIN, Appellant-Respondent, et al., Defendants.—Resettled judgment, Supreme Court, New York County (Louis Grossman, J., after a nonjury trial), entered March 11, 1986, and final judgment entered on November 21, 1985 pursuant to order entered on the same date, which awarded plaintiff Norman Eisner the sum of $200,000 plus interest and costs against defendant Arthur D. Goldstein, are reversed, on the law, without costs, and the complaint is dismissed. Plaintiff's cross appeal from the resettled judgment is deemed an appeal from the decision dated and filed August 16, 1985 insofar as it directed dismissal of his first five causes of action, and, so considered, is dismissed, without costs.

Eisner and Goldstein were longtime neighbors, both residing in Kings Point, Long Island. Although a member of the New York Bar specializing in real estate matters, at the time period pertinent here Goldstein had become engaged on a virtually full-time basis in the business of importing gems from the Soviet Union. On a trip to Moscow in 1980, Goldstein met defendant Gianluigi Cerasi, a resident of Milan, Italy, who was also engaged in the Russian gem business. Because his father was a prominent leader of the Italian Communist Party, Cerasi had access to a number of superior gem sources in Russia closed to Goldstein. In February 1981, Cerasi informed Goldstein that a large quantity of Ural Alexandrite was available for purchase in the Soviet Union for the first time since 1914 at a price of $200,000. Later that month Eisner was introduced to Cerasi in Goldstein's home at a

social gathering. Thereafter Goldstein interested Eisner in investing $200,000 for the proposed purchase of the bulk Alexandrite in return for a two-thirds interest in any profits which might be realized from marketing the stones. In a subsequent meeting in March 1981, attended by David Zaretsky, Eisner's business advisor who was also a lawyer, Goldstein stated that Cerasi had inspected the Alexandrite which was then in rough form imbedded in a solid matrix requiring cutting and polishing. Goldstein added that Cerasi had estimated the lot to contain 60,000 carats of Ural Alexandrite of which approximately one third would yield gems of marketable quality. In accordance with Zaretsky's advice, since only Cerasi had inspected the material and Cerasi was known only to Goldstein, Eisner demanded that Goldstein furnish a guarantee vouching for Cerasi's honesty. In late March 1981, Goldstein provided Eisner with an unsigned two-page typewritten "memorandum of understanding" which among other things contained a fourth paragraph which reads as follows: "Gianluigi Cerasi has inspected each of the pieces in this parcel and he computes that approximately one-third of them are of high quality, that is clear and clean."

The trial court properly found that this memorandum was not a contract but simply "nothing more than a record of what had taken place between the parties up to the time of its writing" and therefore lacked any contractual force. When Goldstein delivered this unsigned document, Eisner objected that there was no guarantee of Cerasi's honesty as he had demanded. Thereupon Goldstein prepared and delivered to Eisner a handwritten paper on the letterhead of Goldstein's importing company reading in its entirety as follows:

> "To Whom It May Concern,
> "I Arthur Goldstein hereby guarantee the honesty and trustworthiness of Gianluigi Cerasi. He would not misrepresent the existence of the Alexandrite or be involved in any SCAM type thing to walk off with the money or the stones or other dishonest or larcenous acts. I will assume the responsibility if this is not true.
> "Arthur".

From March 30 through April 6, 1981, Eisner remitted his $200,000 to Cerasi by telex to Switzerland and Moscow. In early May, Cerasi accompanied the shipment of the Alexandrite roughs by air to the United States where he met Eisner, Zaretsky, Goldstein and a gem cutter, one Morris Winkler, and Eisner examined the stones for the first time at Gold-

stein's home. Eventually, about 30 finished stones were recovered from the rough material, but Goldstein's best marketing efforts resulted in a sale of only two for $2,400. Eisner never received back any portion of his $200,000 investment, and this lawsuit followed.

We do not differ with the conclusion of the trial court that the guarantee instrument, despite its inartful draftsmanship, is an enforceable agreement to be construed to effectuate its apparent purpose *(Community Natl. Bank & Trust Co. v Cognetta,* 88 AD2d 897), and, since it was prepared by the guarantor, any ambiguity is to be construed against him *(La Mar Hosiery Mills v Credit & Commodity Corp.,* 28 Misc 2d 764). Nor do we find any absence of consideration, since it was within the province of the Trial Judge to credit Eisner's testimony that he obtained the guarantee before dispatching his last installment payment to Cerasi. What is entirely missing from the record, however, is any proof that Cerasi was "involved in any SCAM type thing * * * or other dishonest or larcenous acts." No one contends that he misrepresented "the *existence* of the Alexandrite" or that he "walk[ed] off" with either the money or the stones. The only finding in the decision of the trial court addressed to the issue of Cerasi's honesty was the following: "It clearly appears from the testimony adduced at trial that the stones delivered were indeed Alexandrite, but that the quality of the stones were *[sic]* greatly misrepresented. These facts cast doubt on the 'honesty and trustworthiness' of Cerasi. The fact that Cerasi was served in this case, yet failed to appear or submit to an examination, strengthens this Court's determination that Cerasi was involved in some type of dishonest act or scam."

The conclusion of Trial Term that Cerasi was dishonest within the meaning of the guarantee thus rests on two distinct propositions: (1) that the quality of the stones was misrepresented, and (2) that Cerasi's alleged defaults in the litigation itself were indicative of dishonesty. Neither claim withstands analysis. First, even if Cerasi's statement went beyond mere opinion to the level of a representation that one third of the stones was of high quality (i.e., clear and clean), and that representation was false, there is no showing whatever to negate either honest mistake, or at worst negligence on Cerasi's part. Fraudulent or larcenous intent cannot be presumed simply from the fact that this undertaking proved to be folly. It is significant to note that when Cerasi arrived in the United States with the gems and participated in their immediate inspection, Eisner himself testified that Goldstein,

and the gem cutter, Winkler, were extremely enthusiastic about the quality of the stones and optimistic about their potential gemstone yield. This spontaneous reaction from a disinterested expert does much to exonerate Cerasi. Plaintiff's own experts on the trial conceded that prior to the cutting of a raw stone its quality and value cannot be ascertained with any certainty. Cerasi may have been naive, overenthusiastic, or indeed careless in furnishing his "clear and clean" description of the raw material, but that is a far cry from larceny or dishonesty. As the Trial Judge himself observed, it would be "a wild presumption" to assume that Cerasi "got anything out of" this transaction for himself. And, as plaintiff's counsel conceded at trial, the guarantee does not make the slightest reference to quality. Its tenor is simply that of a fidelity bond.

Second, insofar as the trial court's assessment of Cerasi as lacking in honesty rested upon his conduct in this litigation, those findings were simply erroneous. Cerasi had, in fact, served a notice of appearance in this action. True, he never answered the complaint. But the nonservice of a pleading by a foreign national in a civil action brought against him here can be just as easily explained by the absence of any assets within the New York jurisdiction, a possibility that ripens into likelihood since plaintiff has never moved to enter a default judgment against Cerasi. It is also undisputed that plaintiff never sought to depose Cerasi, although his address in Italy was known. Thus no inference adverse to Cerasi's good faith arises from these circumstances.

Plaintiff's "cross appeal" from the dismissal of his first five causes of action is not properly before this court because that determination is not contained in either judgment, and no appeal lies from a mere decision. Nevertheless such determination while not appealable is reviewable (*Parochial Bus Sys. v Board of Educ.,* 60 NY2d 539, 545-546) and accordingly we have examined the propriety of their dismissal to discern whether any of these causes of action could sustain the judgment appealed from. Suffice to say we find no error in the trial court's dismissal of these claims based upon breach of warranty, fraud and an alleged cause of action arising under the Uniform Commercial Code. We agree that plaintiff's proof was insufficient to establish either a partnership or joint venture between Goldstein and Cerasi so that a misrepresentation by Cerasi, without more, would cast Goldstein in liability. Concur—Carro, J. P., Kassal, Rosenberger and Wallach, JJ.